TANNER C. ROLFES (Missouri Bar No. 72987) (Pro Hac Vice Application Pending)
ROSENBLUM SCHWARTZ FRY & JOHNSON, P.C.
120 S. Central Ave., Suite 130
Clayton, MO 63105
Telephone: (314) 862-4332
Facsimile: (314) 354-8271
E-mail: Trolfes@RSFJLaw.com

LANDON D. BAILEY (California Bar No. 240236)
BAILEY PLC
1200 Suncast Lane, Suite 7
El Dorado Hills, CA 95762
Telephone: (916) 713-2580
Email: landon@baileyplc.com

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARTIN ALAN LARSEN, individually and as Successor in Interest to CANDACE LARSEN, Deceased;<br>JULIA DEANNA LARSEN, individually;<br>LAUREN K. MELVILLE, individually;<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | CASE NO.:<br><br>**COMPLAINT** |

**COMPLAINT FOR DAMAGES UNDER THE FEDERAL TORT CLAIMS ACT**

Plaintiffs Martin Alan Larsen, individually and as Successor in Interest to Candace Larsen, Deceased, Julia Deanna Larsen, individually, and Lauren Melville, individually, allege as follows against Defendant United States of America:

## I. NATURE OF THE ACTION

1. This is an action for damages under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671–2680, arising from negligent medical, psychiatric, mental-health, medication-management, triage, risk-assessment, communication, warning, and discharge or release decisions by employees and agents of the Department of Veterans Affairs ("VA") acting within the course and scope of their federal employment.

2. Plaintiffs' claims arise from the VA's negligent care of Julia Deanna Larsen, a Navy veteran with known and documented psychiatric conditions and symptoms, including post-traumatic stress disorder, bipolar disorder, psychosis, paranoia, anxiety, prior inpatient psychiatric hospitalization, medication instability, and prior suicidal-risk indicators.

3. On January 3, 2022, Julia and her family sought acute psychiatric intervention from the VA. VA personnel misdirected Julia and her parents to the Chico Community-Based Outpatient Clinic ("Chico CBOC") rather than to the Sacramento VA Medical Center in Mather, California, or another facility capable of immediately evaluating and stabilizing Julia's acute psychiatric crisis.

4. After Julia presented to Chico CBOC in crisis, VA personnel failed to provide adequate mental-health triage, failed to complete an adequate suicide, violence, homicide, psychosis, and lethal-means risk assessment, failed to involve Julia's parents in risk assessment despite knowing Julia was leaving in their care, failed to communicate known threats and acute dangers to Candace Larsen and Martin Alan Larsen, failed to instruct them to secure firearms and

dangerous weapons, and failed to refer or transport Julia for immediate emergency psychiatric assessment.

5. Hours later, at the Larsen residence in Red Bluff, California, Julia suffered a severe mental breakdown and psychotic break. During an extended incident captured in part on a recorded 911 call, Julia attacked her parents. Candace Larsen was beaten and shot through the groin, the bullet passing through her femoral vein, causing prolonged conscious pain, fear, terror, blood loss, and death. Martin Larsen was beaten, struck, bitten, lacerated, and severely injured while fighting to survive and while trying to protect his wife and daughter. Julia herself suffered multiple gunshot wounds and catastrophic physical, psychiatric, reputational, and liberty-related injuries.

6. Plaintiffs seek damages from the United States of America for wrongful death, survival damages, and individual personal injuries caused by VA negligence under circumstances where a private person would be liable under California law.

## II. PARTIES

7. Plaintiff Martin Alan Larsen is a natural person and resident of California. At all relevant times, Martin was married to Decedent Candace Larsen and was Candace's surviving spouse.

8. Martin brings this action in his individual capacity for his own physical, emotional, psychological, medical, economic, and other injuries caused by the VA's negligence.

9. Martin also brings this action as Candace's surviving spouse and heir for wrongful-death damages under California Code of Civil Procedure § 377.60.

10. Plaintiff Martin Alan Larsen further brings this action as the successor in interest to Candace Larsen, Deceased, pursuant to California Code of Civil Procedure § 377.30 and 377.32, to assert the survival claims that belonged to Candace Larsen and survived her death under

California law.

11. Candace Larsen died on January 4, 2022, in Red Bluff, California. Candace Larsen was Martin Alan Larsen's spouse at the time of her death. No estate has been opened for Candace Larsen, and no proceeding is now pending in California for administration of Candace Larsen's estate.

12. Martin Alan Larsen is Candace Larsen's successor in interest within the meaning of California Code of Civil Procedure §§ 377.11, 377.30, and 377.32.

13. As Candace Larsen's surviving spouse, Martin Alan Larsen is authorized to commence and maintain this action on Candace Larsen's behalf with respect to claims that survived her death, including claims for Candace Larsen's pre-death injuries and damages recoverable under California Code of Civil Procedure §§ 377.20 and 377.34.

14. No other person has a superior right to commence or maintain Candace Larsen's surviving causes of action in this litigation. To the extent required, Martin Alan Larsen will file with this Court a declaration under penalty of perjury satisfying California Code of Civil Procedure § 377.32, together with a certified copy of Candace Larsen's death certificate.

15. Martin Alan Larsen seeks to recover, as Candace Larsen's successor in interest, all damages recoverable in a California survival action and under the FTCA, including damages for Candace Larsen's pre-death injuries, conscious pain, suffering, fear, terror, and other damages permitted by law.

16. Decedent Candace Larsen was, at all relevant times before her death, a resident of California. Candace was Martin's spouse and the mother of Julia Larsen and Lauren Melville. Candace died as a direct and proximate result of the negligent acts and omissions alleged in this Complaint.

17. Plaintiff Julia Deanna Larsen is a natural person, Navy veteran, and resident of

California. Julia brings claims individually for physical injuries, psychiatric injuries, emotional distress, medical expenses, lost income and earning capacity, loss of freedom, reputational harm, and other damages caused by the VA's negligent medical and mental-health care.

18. Plaintiff Julia Deanna Larsen also brings this action in her individual capacity as the surviving child and heir of Candace Larsen, Deceased, to recover wrongful death damages pursuant to California Code of Civil Procedure § 377.60.

19. Plaintiff Lauren Melville is a natural person and resident of the State of California. She brings this action in her individual capacity as the surviving child and heir of Candace Larsen, Deceased, to recover wrongful death damages pursuant to California Code of Civil Procedure § 377.60.

20. Defendant United States of America is the proper defendant under the FTCA for tort claims arising from negligent acts and omissions of VA employees and agents acting within the course and scope of federal employment.

21. At all relevant times, the VA employees and agents whose acts and omissions are alleged in this Complaint were acting within the course and scope of their employment or agency with the United States, including through the VA facilities, clinical programs, and mental-health services described below.

## III. JURISDICTION AND VENUE

22. This Court has subject-matter jurisdiction under 28 U.S.C. § 1346(b)(1) because Plaintiffs seek money damages against the United States for personal injury and death caused by negligent or wrongful acts or omissions of federal employees acting within the scope of their employment, under circumstances in which a private person would be liable under California law.

23. Plaintiffs' claims are brought pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680. Under the FTCA, liability is determined by the law of the place where the negligent acts or omissions occurred.

24. Venue is proper in the Eastern District of California under 28 U.S.C. § 1402(b) because Plaintiffs reside in California and because the acts, omissions, injuries, death, and operative events occurred in California, including within this District.

25. The shooting and fatal incident occurred at Martin Larsen's residence, located at 14845 Hilltop Drive, Red Bluff, California 96080, within the Eastern District of California.

26. The VA facilities, personnel, and conduct at issue include, without limitation, the Chico Community-Based Outpatient Clinic/Chico VA Behavioral Health Outpatient Clinic, 1601 Concord Avenue, Chico, California 95928-9486; the Sacramento VA Medical Center, 10523 Hospital Way, Mather, California 95655-4200; the Bakersfield VA Clinic Mental Health, 1801 Westwind Drive, Bakersfield, California 93301-3028; and related VA clinical resource hub, psychiatric, medication-management, triage, and mental-health services.

## IV. INTRADISTRICT ASSIGNMENT

27. Because this lawsuit arose in Tehama and Butte County, this action is properly commenced in, and should be assigned to, the Court's Sacramento venue pursuant to E.D. Cal. Local Rule 120(d).

## V. STATEMENT OF FACTS

### Julia Larsen's Military Service, Trauma and VA Treatment History

28. Julia Deanna Larsen served in the United States Navy from June 26, 2012, to June 26, 2016. Her military occupational specialty was Aviation Boatswain's Mate — Aircraft Handling.

29. Julia deployed twice to the Middle East aboard the U.S.S. Kearsarge amphibious assault ship in 2013 and 2015–2016.

30. On March 8, 2016, while aboard the U.S.S. Kearsarge in the Persian Gulf, Julia responded to the explosion of a Marine AV-8B Harrier jet on the flight deck as it prepared to depart for a mission in support of Operation Inherent Resolve. The incident was classified as a Class A mishap.

31. During her Navy service, Julia was sexually assaulted on two separate occasions and endured harassment.

32. One assault was committed by her supervisor, who forcibly groped her and removed her clothes.

33. Multiple people came forward in support of Julia; Julia changed ships; and the supervisor was dishonorably discharged.

34. On another occasion, Julia was raped by another Navy servicemember.

35. Since those events, Julia has experienced daily disturbing flashbacks and intrusive memories from the flight-deck explosion and sexual assaults, along with nightmares, panic attacks, and anxiety.

36. Julia was honorably discharged on June 26, 2016. After discharge, she received significant care through VA medical facilities and was diagnosed with conditions including post-traumatic stress disorder, bipolar disorder, psychotic symptoms, paranoia, and anxiety.

37. From December 2016 to January 2017, Julia underwent treatment at the Bakersfield VA Community-Based Outpatient Clinic, where a psychiatrist initially diagnosed post-traumatic stress disorder and attention deficit/hyperactivity disorder and prescribed bupropion and later methylphenidate.

38. In the summer of 2017, after a 5150 72-hour hold at Crestwood Hospital in Bakersfield due to persecutory paranoia and being a danger to herself, Julia sought treatment at the Chico CBOC.

39. During her initial Chico CBOC visit, Julia was accompanied by her parents, Candace and Martin Larsen. The triage social worker documented Julia's paranoia, agitation, and physical aggression toward her parents.

40. Two days later, Julia was admitted for eight days to John Muir Hospital in Concord, California, from June 25, 2017, through July 3, 2017, for psychosis symptoms and being a danger to herself.

41. After discharge from inpatient care, VA providers repeatedly documented Julia's reports that she wanted to stop taking certain medications or that medications were ineffective.

42. From the summer of 2017 through the spring of 2020, Julia continued telehealth services through the VA. During that period, different psychiatrists, sleep-medicine physicians, primary-care physicians, clinical pharmacy specialists, and other providers repeatedly changed Julia's medication types and dosages.

43. During that period, VA providers intermittently prescribed benzodiazepines for anxiety, antipsychotic medication for paranoid thoughts, amphetamine-dextroamphetamine for inattention, trazodone for sleep, and sertraline for depression.

44. In the spring of 2020, Julia reported increased anxiety and paranoid thoughts. A VA telehealth psychiatrist prescribed risperidone for "thoughts," clonazepam for anxiety, quetiapine for sleep, restarted sertraline, and discontinued amphetamine-dextroamphetamine.

45. About a week later, Julia was voluntarily admitted to the Sacramento VA Medical Center behavioral-health intensive care unit for three days with a diagnosis of psychotic disorder.

46. Approximately one week after discharge, the telehealth psychiatrist documented that Julia presented in a “somewhat euphoric and hypomanic state” and diagnosed bipolar disorder.

47. The next day, a nurse documented that Julia called and stated she no longer wanted VA services, wanted to take a break from care, and requested a new doctor. A social worker consulted with the telehealth psychiatrist and documented that changing providers was not recommended “at this critical moment.”

48. Despite that warning, about two weeks later Julia’s VA mental-health team changed her medication-management provider to a clinical pharmacy specialist.

49. In early summer 2020, Julia attended her first appointment with that clinical pharmacy specialist, who continued medication management, including aripiprazole for mood and clonidine for anxiety.

50. Julia continued medication management with that clinical pharmacy specialist through early 2021, when she requested transfer to another psychiatrist.

51. When Julia reported to the new clinical psychiatrist, her medication was again changed: aripiprazole was continued, lamotrigine was added for mood, and restarting amphetamine-dextroamphetamine was deferred.

52. One month later, Julia’s mood, impulsivity, distraction, procrastination, and task completion improved. Julia was then told to restart amphetamine-dextroamphetamine.

**Julia Larsen’s Medication Mismanagement:**

53. In the summer of 2021, Julia requested medication for anxiety. A VA clinical pharmacy specialist prescribed hydroxyzine.

54. Approximately one month later, Julia requested medication for anxiety and sleep.

55. The clinical pharmacy specialist prescribed gabapentin, continued lamotrigine and aripiprazole, and discontinued clonidine and hydroxyzine because Julia was no longer taking them.

56. The clinical pharmacy specialist also noted that amphetamine-dextroamphetamine could contribute to anxiety or insomnia and advised the clinical resource hub psychiatrist to consider decreasing, discontinuing, or temporarily suspending that medication.

57. At a scheduled follow-up four days later, the clinical resource hub psychiatrist prescribed zolpidem for poor sleep and alprazolam for anxiety while continuing amphetamine-dextroamphetamine, lamotrigine, and aripiprazole.

58. Two weeks later, a clinical resource hub nurse documented that Julia reported discontinuing aripiprazole and lamotrigine and resuming cannabis use.

59. In response, the clinical resource hub psychiatrist discontinued zolpidem and alprazolam, documenting that Julia had reported increased anxiety and insomnia because she was no longer using cannabis and that she had restarted cannabis.

60. In September 2021, Julia's overall mental health had improved, but she wanted to stop taking mood-stabilizing medication.

61. The clinical resource hub psychiatrist told Julia that stimulant medication could not be prescribed without a mood stabilizer.

62. At the end of that appointment, the psychiatrist told Julia he was leaving the VA.

63. In November 2021, Julia met in person for the first time with psychiatric nurse practitioner David Ealy.

64. Ealy documented that Julia said, "I was telling them what they wanted to hear for a year, just so I could get the Adderall, but I wasn't taking the mood stabilizer then and I've been fine." Plaintiffs allege that this documentation was false or misleading.

65. Ealy then prescribed atomoxetine for inattention and asked Julia to follow up in two months.

66. Julia requested another meeting with Ealy two days later to better address her needs.

67. Contrary to the standard of care for a reasonably competent psychiatric nurse practitioner, Ealy prescribed time-limited bupropion and advised Julia to continue atomoxetine, again with a follow-up in two months.

68. Ealy did not explain the risks of severe adverse drug interaction between atomoxetine and bupropion and did not explain the inherent risk of treating ADHD symptoms with those medications before Julia's bipolar disorder had been successfully treated and stabilized.

69. VA policies and accepted clinical guidelines required providers to use evidence-based pharmacotherapy, choose medications appropriately, monitor side effects and outcomes, modify treatment as appropriate, and monitor treatment with appropriate frequency.

70. Clinical practice guidelines state that patients with one or more manic episodes should be encouraged to continue lifelong treatment with a mood stabilizer or antipsychotic medication.

71. Clinical practice guidelines also recognize that, for patients with co-occurring ADHD and bipolar disorder, treatment should focus on management of bipolar disorder and that ADHD medication without mood stabilization is not recommended.

72. Medication guidelines further warn that treating ADHD symptoms may induce a manic episode in patients at risk for bipolar disorder.

73. Atomoxetine is a non-stimulant medication approved to treat ADHD. Although not a stimulant like Adderall, atomoxetine is similarly contraindicated or requires close monitoring in

patients with co-occurring bipolar disorder, particularly before bipolar symptoms are successfully managed.

74. Bupropion is approved for depression and is sometimes used off label for ADHD. Combining atomoxetine and bupropion can cause drug interaction and increase the risk of adverse drug reaction, including psychotic or manic symptoms.

75. The Department of Veterans Affairs, Office of Inspector General (VAOIG) later found that the nurse practitioner failed to align medication management with established treatment guidelines, failed to document a comprehensive rationale for medication choices for a complex patient, failed to document medication instructions accurately, and failed to schedule a follow-up appointment within the expected timeframe after prescribing a new medication regimen.

76. In November 2021, Ealy told Julia to follow up "in two months or sooner if needed." Julia's follow-up after being prescribed a contraindicated or high-risk medication regimen was not scheduled until January 22, 2022.

77. In a later VAOIG interview, Ealy acknowledged that a one-month follow-up appointment "at-minimum" would have been appropriate but stated that scheduling challenges caused a two-month follow-up. The Chief Medical Director for Mental Health Services told VAOIG that a two-week follow-up was "ideal" and four-week follow-up was "reasonable."

**VA Crisis Contacts and Failed Triage on January 3, 2022**

78. On January 3, 2022, twenty-two days before her scheduled follow-up appointment, Julia reached out to the VA in crisis seeking mental-health treatment.

79. Julia and her loved ones recognized that she was "losing the fight" with mental illness and needed acute care at this point in time.

80. Julia agreed that she needed to proceed to the Sacramento-area VA hospital in Mather, California, for a higher level of intervention. She did not waver in seeking that higher level of care throughout the day.

81. As Julia and her family understood the protocol, they were required or expected to contact the local VA provider, the Chico CBOC, as the first step to receiving treatment at a higher-level facility.

82. The medical support assistant who spoke with Julia relayed to the vocational nurse that Julia was in crisis and very anxious.

83. Julia contacted her mother, Candace Larsen, and stated, "come be with me." Ignacio Gutierrez also contacted Candace by phone and had a ten-minute discussion about Julia's mental crisis and urgent need for VA care.

84. The vocational nurse attempted to reach Julia by phone, but Julia did not answer.

85. Candace then contacted the vocational nurse by phone and asked what steps the family needed to take.

86. The vocational nurse consulted with the nurse practitioner by instant message. In that exchange, the vocational nurse asked, "What is the best option? Have the patient pick up the Zolpidem at Chico or go," referring to the behavioral-health intensive care unit at the Sacramento VA Medical Center.

87. The nurse practitioner responded that the patient "being assessed is the best option" and that "zolpidem isn't likely to have much mood stabilizing effect."

88. The VAOIG later concluded that the nurse practitioner meant that Julia should proceed to the Sacramento VA Medical Center for assessment.

89. The vocational nurse, however, miscommunicated that direction and told Candace that Julia should present to Chico CBOC for mental-health triage.

90. Around 2:30 p.m., having been misdirected to a facility that was not staffed to address Julia's acute needs, Julia, Candace, and Martin arrived at the Chico VA Mental Health Clinic.

91. The VA record reflects: "Veteran arrived, accompanied by her mother. She is highly agitated, restless/fidgety, teary and demanding to be prescribed Xanax for anxiety." The record further states: "In attempt to engage her in assessment about recent symptoms, she reports poor sleep with no detail but repeats, 'I need to sleep.' Julia asked her mother why she needed to sleep. Her mother was at a loss and repeated what the record had already explained."

92. Julia would not look the triage social worker in the face, denied current diagnoses of depression and bipolar disorder, and expressed frustration with her recent prescribing-provider change.

93. During rapid triage screening, VA staff attempted to complete a Columbia Suicide Severity Rating Scale screener, but Julia was almost completely inattentive and irritable.

94. When asked whether, over the past month, she had wished she were dead or wished she could go to sleep and not wake up, the record states: "Would not engage in assessment."

95. When asked whether, over the past month, she had actual thoughts of killing herself, the record states: "Would not engage in assessment."

96. Several subsequent questions were marked "Response not required due to responses to other questions," not because Julia was safely assessed, but because the assessment had broken down.

97. When asked whether, in her lifetime, she had ever done anything, started to do anything, or prepared to do anything to end her life, including collecting pills, obtaining a gun, giving away valuables, or going to the roof but not jumping, Julia answered: "Yes."

98. When asked whether this had occurred within the past three months, the record states: “Would not engage in assessment.”

99. Despite Julia’s crisis presentation, inability to engage in the evaluation, agitation, paranoia, family concerns, known psychiatric history, medication risks, and affirmative response regarding prior suicidal preparations, the triage social worker marked Julia’s disposition as “Routine” and concluded Julia “did not appear to be at imminent risk to harm self or others.”

100. Candace told the VA worker that Julia had increased paranoid ideation and behavior, current levels of stress, and possible psychotic symptoms. Candace was cut off from continuing.

101. The Chico CBOC had no same-day prescribing-provider availability that day. The nurse practitioner’s schedule was completely full.

102. The Assistant Chief of Mental Health Services later told VAOIG that same-day appointments were reallocated because two prescribing providers were no longer providing medication-management services at Chico CBOC.

103. VAOIG found that leaders’ failure to ensure prescribing providers’ same-day availability for urgent mental-health needs may contribute to increased risk of adverse clinical outcomes, including suicide, violence, and need for a higher level of care.

104. The VA staff member told Candace that the next available appointment with Nurse Practitioner David Ealy was January 14, 2022, and that there was nothing they could do at the facility.

105. VA personnel released Julia to leave with her parents, knowing the Larsens planned to take Julia to their home, yet failed to warn Candace or Martin about acute risk, failed to instruct them to remove or secure firearms or other weapons, failed to escalate Julia for emergency

evaluation, failed to send her to Mather or Enloe Emergency Department, and failed to complete a meaningful suicide, homicide, violence, psychosis, medication, or lethal-means assessment.

106. VAOIG found that staff failed to provide Julia adequate mental-health triage and assessment, provided insufficient continuity of medication management, and that the triage social worker should have engaged Julia's family to assess risk of suicide, violence, and lethal-means access.

107. The triage social worker admitted to VAOIG that she was unable to engage Julia in lethality assessment for suicide and homicide and was unfamiliar with appropriate procedures when patients are unable to engage in risk assessment for suicide and violence.

108. The triage social worker claimed she did not engage Candace about Julia's risk for suicide and violence because "asking the family member would have further agitated the patient." That explanation confirms that VA personnel knew Julia was acutely agitated and unstable, yet still failed to perform the family-based assessment required under the circumstances.

109. Julia's VA medical file further reflected that Julia had communicated past threats to her parents and had declared paranoid delusions and intentions to harm them outside her parents' presence. Those serious threats were not communicated to Candace or Martin.

**VAOIG Findings and Post-Incident Record Addendum**

110. The Department of Veterans Affairs Office of Inspector General issued Report No. 22-01363-62, titled Inadequate Outpatient Mental Health Triage and Care of a Patient at the Chico Community-Based Outpatient Clinic in California.

111. Although the VAOIG did not interview Julia, Martin, Ignacio Gutierrez, and other crucial witnesses, the VAOIG still identified serious failures by VA personnel and leadership that contributed to the tragedy.

112. VAOIG found concerns related to same-day access, including miscommunication between staff members and inadequate prescribing-provider availability.

113. VAOIG found that staff failed to provide Julia adequate mental-health triage and assessment.

114. VAOIG found that VA staff provided insufficient continuity of medication management.

115. VAOIG found that staff failed to adequately assess Julia's suicide and violence risk when she presented in crisis to Chico CBOC.

116. VAOIG found that the triage social worker should have engaged Julia's family to assess suicide risk, violence risk, and lethal-means access.

117. VAOIG found that the nurse practitioner failed to align medication management with established treatment guidelines, failed to document a comprehensive rationale for medication choices, failed to document medication instructions accurately, and failed to schedule a follow-up within the expected timeframe after prescribing a new medication regimen.

118. In early December 2021, before the incident, VISN leaders reviewed facility leaders' proposal for increased mental-health staffing and funding. Chico CBOC staff had reported shortages of mental-health providers, including the absence of an on-site prescribing provider.

119. Facility mental-health leadership also expressed concern that the Chico CBOC building design used a large common area, limited patient privacy and confidentiality, did not feel "warm" or "homey," and failed to provide emotional safety for incoming patients.

120. Approximately one month after the incident, VA personnel took actions consistent with an attempted after-the-fact justification or cover-up by making an addendum to Julia's medical records stating that the triage social worker "did not find [the patient] to be danger to self or others, but rather [the patient's] presentation was consistent with drug seeking behavior."

121. Plaintiffs allege that this late addendum is false, misleading, and contradicted by the circumstances, witness accounts, first-responder observations, the recorded 911 call, Julia's presentation before and after leaving Chico CBOC, and the VAOIG's own findings.

122. Julia's observed condition after leaving Chico CBOC and after arriving at her parents' home was entirely inconsistent with mere drug-seeking behavior and was instead consistent with a severe mental-health breakdown and psychotic break, the onset of which had been apparent at Chico CBOC.

123. Julia should have been sent to Mather or another emergency department for immediate assessment, as the nurse practitioner originally indicated and as later admitted in substance by VA personnel. Instead, Julia was given the next available appointment many days later.

**The January 3–4, 2022 Incident at the Larsen's Residence**

124. The fatal incident occurred at the Larsen's residence, located at 14845 Hilltop Drive, Red Bluff, California 96080, in the Eastern District of California.

125. The Larsen family returned home from the VA at approximately 4:00 p.m. Julia told her parents she had taken her sleeping medication and went to her parents' room to try to sleep.

126. Later that evening, Candace and Martin were watching a movie in the living room.

127. Around 10:50 p.m., Candace and Martin heard Julia's voice coming from the master bedroom.

128. Looking around the corner through the bedroom hallway, Candace and Martin saw Julia wielding a 9mm firearm in a manic and incoherent state.

129. Candace rushed to call 911 as Julia, in a deeply psychotic state, slowly walked down the hallway yelling at her parents not to leave the residence.

130. Martin attempted to disarm Julia, and a violent melee ensued.

131. The recorded 911 call captured extensive audio in Candace's voice relaying the unfolding tragedy to the operator, as well as Julia desperately begging for help throughout the call.

132. From approximately 10:54 p.m. to 11:53 p.m., the 911 recording captured an excruciating struggle that resulted in significant bloodshed.

133. During the struggle, Julia repeatedly struck Martin in the head and neck, gouged at his eyes, bit him, lacerated him, and caused numerous fractures and other serious injuries.

134. Martin fought to remain conscious because he believed that if he lost consciousness, he and Candace would die.

135. Candace was repeatedly beaten in the head and face. She was then shot through the groin area, with the bullet passing through her femoral vein and exiting through her buttock.

136. Candace experienced prolonged physical pain, fear, and terror of impending death. Before being shot, Candace experienced the nightmare of seeing her daughter, who was also her best friend, in deep psychosis, shooting in the home while pleading for help.

137. Law-enforcement crime-scene reports documented that Candace struggled over an extended period to reach safety, leaving drag marks in blood, but ultimately bled to death from the gunshot wound.

138. At one point in the recorded 911 call, after Candace had been shot but before she died, Martin can be heard screaming, "Candy! Candy! Candy!" Candace eventually responded, "I'm here!" Martin screamed back, "I'm dying!"

139. Martin was forced to act in desperate self-defense and defense of Candace and Julia. Julia sustained multiple gunshot wounds as Martin fought to survive and to stop the attack.

140. At approximately 11:53 p.m., Julia exited the home, allowing Martin to lock himself inside the residence.

141. Julia was covered in blood and unresponsive to police commands.

142. Through the 911 line, Martin stated that he had located both firearms that Julia had inside the residence.

143. Martin can be heard on the recorded 911 call stating, “my wife is bleeding to death here and my daughter shot her. It’s the worst thing I’ve ever experienced.”

144. Shortly after, Martin can be heard stating, “she [Julia] was kind of suicidal in a way, I had a gun pointed at her and she didn’t care. I had to shoot her in the leg just to stop. She’s actually, she really, really needs help. We tried to get her help at the VA, and, oh God, the VA didn’t really help that much.”

145. The 911 operator responded, “I’m sorry the VA didn’t help her.”

146. At approximately 12:08 a.m. on January 4, 2022, Julia was handcuffed, and Martin was advised to exit the residence.

147. Martin was covered in blood, and medical personnel attended to his injuries.

148. After the scene was secure, medical personnel entered the residence to provide Candace immediate medical attention.

149. At approximately 12:26 a.m. on January 4, 2022, Candace Larsen was pronounced deceased.

150. Martin and Julia were transported to the hospital with significant, life-altering injuries.

**Candace Larsen’s Injuries and Death**

151. Candace Larsen suffered repeated blunt-force injuries to the head and face, a gunshot wound through the groin, a femoral vein injury, catastrophic blood loss, prolonged pain, fear, emotional distress, terror, and ultimately death.

152. Candace's cause of death was blood loss due to the gunshot wound.

153. Candace survived for a period after being shot and endured conscious pain, suffering, fear, and terror before death.

154. The survival claims arising from Candace Larsen's injuries include all damages recoverable under California Code of Civil Procedure §377.34 and other applicable law, including economic damages, pre-death pain, suffering, disfigurement, fear, terror, and all other recoverable survival damages.

155. The wrongful death claims asserted by Candace Larsen's surviving spouse and surviving children include all damages recoverable under California Code of Civil Procedure §377.60 and other applicable law, including the loss of love, companionship, comfort, care, assistance, protection, affection, society, moral support, financial support, household services, funeral and burial expenses to the extent recoverable, and all other recoverable wrongful death damages.

**Martin Larsen's Injuries**

156. Martin suffered severe physical and psychological injuries during the attack, including but not limited to head and neck trauma, eye injuries, bites, lacerations, fractures, concussion symptoms, rib fractures, spine injuries, shoulder aggravation, ulcerative colitis related to trauma, weight loss, respiratory complications, depression, anxiety, flashbacks, and continuing pain.

157. At Mercy Medical Center in Redding, California, Martin underwent CT imaging of the chest, abdomen, pelvis, head, thoracic spine, lumbar spine, and related areas.

158. Imaging revealed acute and chronic bilateral rib fractures, chronic compression deformity at T9, acutely displaced left anterior 5th and left anterolateral 6th rib fractures, acute mildly displaced right anterior 3rd and 4th rib fractures, and acute mildly displaced right lateral 6th and 7th rib fractures.

159. CT imaging of the head revealed left parietal scalp soft-tissue swelling and acute encephalopathy likely secondary to concussion.

160. CT imaging revealed intraparenchymal hematoma within musculature near the right-side submandibular gland.

161. Martin sustained significant scalp lacerations, including five lacerations totaling more than 13 centimeters and requiring 15 staples.

162. A large hematoma on Martin's right anterior neck required trauma services to order CT angiography. Findings included serious traumatic injuries requiring evaluation for intracranial hemorrhage, calvarial fracture, cervical spine fracture, intrathoracic solid-organ injury, intra-abdominal solid-organ injury, long-bone fracture, and cardiac contusion.

163. Martin returned to the emergency room on January 20, 2022, with shortness of breath, nonstop cough, and excruciating chest pain. He required oxygen and a three-day hospitalization from January 20, 2022, through January 22, 2022, for lung infection and acute pneumonia in the setting of rib fractures and severe chest/rib pain.

164. Martin was discharged with a walker because pain impaired his ability to balance and stand, and he was provided an inhaler for oxygen issues.

165. In February 2022, Martin followed up for neck and back pain. X-rays of the thoracolumbar region showed further collapse of T7 with extensive wedging and persistent T9 compression fracture.

166. Martin required treatment at St. Elizabeth's Hospital for Oncology to address gut-health deterioration and rapid weight loss. He was diagnosed with ulcerative colitis from the trauma, causing significant day-to-day impairment, acute abdominal pain, diarrhea, and the need for IV infusions every six weeks.

167. The ulcerative colitis severely restricts Martin's ability to enjoy normal activities such as hunting and fishing because he cannot be away from immediate restroom access. Martin lost more than 30 pounds, falling from just over 170 pounds to approximately 140 pounds.

168. Martin had undergone total left shoulder replacement surgery at Stanford Hospital in January 2019. During the incident, he reinjured the shoulder, leaving him with difficulty lifting above shoulder height and everyday aching. He treats with acupuncture, lidocaine 5% patches, and other conservative measures.

169. On March 2, 2023, Martin underwent a full spine MRI showing osseous fusion of C6 and C7, two-column compression fracture of the T7 vertebral body, severe anterior wedging of T7 affecting the T6 and T8 vertebral bodies, and column compression fracture of T9.

170. Martin was advised to consult a spinal surgeon regarding kyphoplasty and/or surgery. His injuries cause him to walk hunched over.

171. At Enloe Neurosurgery and Spine Clinic, Dr. Lyman Witlatch advised that surgical correction would require rebreaking Martin's back because his spine had healed incorrectly. Martin declined surgery due to the extensive recovery and the risk that his back would not fully heal.

172. Martin's vision in his left eye has been severely impacted by traumatic optic-nerve damage and concussion from blows to the head and orbital region. He received treatment from Dr. Brian Haugen of Northridge Eye Care in Red Bluff, California and had a follow-up with a retina

specialist scheduled for April 11, 2024 in Chico, California to determine whether surgery could assist his impaired vision.

173. On or about October 7, 2024, Sarju Patel, M.D., performed surgery on Martin to treat vision impairment resulting from the blunt force trauma to his head and orbital region. The procedure was performed at Retinal Consultants Medical Group in Chico, California.

174. On May 2, 2025, Martin subsequently underwent a second surgical procedure consisting of a left eye lens replacement to treat the continuing effects of his traumatic eye injuries and vision impairment at Northridge Eye Care in Red Bluff, California.

175. Martin is a Navy veteran and worked as a mailman for approximately 35 years. His life was completely upended by the incident. He suffers ongoing depression, anxiety, intrusive flashbacks, triggers, grief over Candace's death, and grief over Julia's condition and loss of freedom.

176. Martin began treatment with a clinical psychologist at St. Elizabeth's Hospital for anxiety and depression and takes medications including buspirone, duloxetine, and trazodone.

**Julia Larsen's Injuries**

177. Julia suffered multiple gunshot wounds and related injuries during the incident, including fractured right rib, liver laceration, traumatic hemopneumothorax, contusion of the head of the pancreas, hyperglycemia, laceration of the left kidney, displaced oblique fracture of the shaft of the humerus, and four gunshot wounds to the right shoulder, left shoulder, and right rib area.

178. Julia underwent surgery to retrieve a bullet from the head of her pancreas, requiring a large incision closed with 28 staples.

179. Julia spent approximately seven days recovering at Mercy Medical Center before arriving at Tehama County Jail on January 11, 2022.

180. The surgery and bullet-related muscle damage have left lasting impairment, reduced upper-body strength, and limitations on physical activities she previously performed.

181. Julia has struggled profoundly to come to terms with the fact that, while psychotic and disconnected from reality, she shot her mother, who was also her best friend. Julia tried to obtain the care she needed on January 3, 2022, and before, but the VA failed her.

182. Julia has endured and will continue to endure severe emotional distress, mental anguish, fractured family relationships, reputational harm, and impairment of future earnings, personal relationships, and future endeavors.

183. Julia spent more than a year in Tehama County Jail. Her criminal case was resolved by dismissal of two of three charges, and she was found Not Guilty by Reason of Insanity on the remaining manslaughter charge.

184. Julia is currently residing at Patton State Psychiatric Hospital, 3102 Highland Avenue, Patton, California 92369, and the length of her stay is unknown. Since January 4, 2022, Julia's freedom has been restricted due to the VA's negligence and will continue to be restricted.

**Submission and Denial of FTCA Claim**

185. Before filing this action, each claim asserted herein was timely presented in writing to the appropriate federal agency, the United States Department of Veterans Affairs, in compliance with 28 U.S.C. § 2675(a).

186. On January 1, 2024, administrative tort claims were presented on Standard Form 95 to the Department of Veterans Affairs, as well as those claims arising from the death of Candace Larsen, on behalf of Candace Larsen by her survivors and, alternatively her estate, stating a claim amount of $75,000,000.00 for wrongful death and $50,000,000.00 for pre-death injuries, pain, suffering and terror.

187. On January 1, 2024, Plaintiff Martin Larsen presented his administrative tort claims on Standard Form 95 to the Department of Veterans Affairs, as well as those claims arising from

the death of Candace Larsen, stating a claim amount under Property Damage of $15,000 and under Personal Injury of $55,000,000 for a total of $55,015,000.

188. On January 1, 2024, Plaintiff Julia Larsen presented her administrative tort claims on Standard Form 95 to the Department of Veterans Affairs, stating a claim amount under Personal Injury of $50,000,000.

189. The VA denied each of these claims in correspondence dated and mailed January 7, 2026, and this action is timely under 28 U.S.C. §§ 2401(b) and 2675(a).

## VI. CLAIMS FOR RELIEF

### Count I – Professional Negligence/Medical Negligence – Julia Deanna Larsen Individually Against the United States

190. Plaintiff Julia Deanna Larsen incorporates by reference all preceding paragraphs as though fully set forth herein.

191. VA providers owed Julia duties to provide care consistent with the standard of care for reasonably prudent psychiatric, psychological, nursing, social-work, pharmacy, triage, and mental-health professionals under like circumstances.

192. Under California law, private psychiatric providers, medical clinics, hospitals, mental-health professionals, triage providers, social workers, and medication-management providers would be liable under like circumstances for negligent professional care, negligent crisis assessment, negligent discharge or release planning, and negligent failure to warn or protect foreseeable and identifiable victims/caregivers.

193. The United States, through VA employees and agents, breached those duties by, among other things:

194. Failing to properly diagnose, treat, and manage Julia's post-traumatic stress disorder, bipolar disorder, psychosis, paranoia, anxiety, and related conditions.

195. Failing to provide continuity of psychiatric care and medication management for a complex patient with known serious mental-health conditions.

196. Repeatedly changing medications and providers without adequate monitoring, rationale, or continuity.

197. Prescribing or continuing atomoxetine and bupropion in a patient with bipolar disorder without adequate stabilization, warning, monitoring, or follow-up.

198. Failing to explain risks of adverse drug interaction and manic or psychotic reaction.

199. Scheduling an unreasonably delayed follow-up after a high-risk medication change.

200. Failing to provide same-day urgent mental-health access on January 3, 2022.

201. Misdirecting Julia and her parents to Chico CBOC rather than Sacramento VA Medical Center or another emergency facility capable of acute psychiatric assessment.

202. Failing to conduct adequate suicide, homicide, violence, psychosis, and lethal-means risk assessments when Julia presented in crisis.

203. Marking Julia's disposition "Routine" despite an acute crisis presentation, inability to engage in assessment, affirmative history of suicidal preparations, paranoia, agitation, and family reports of worsening symptoms.

204. Releasing Julia to her parents' care without adequate stabilization, warning, safety planning, emergency referral, or lethal-means counseling.

205. Making or permitting inaccurate and misleading after-the-fact record entries.

206. These breaches caused or contributed to Julia's psychotic break, the resulting incident, her physical injuries, psychiatric injuries, emotional distress, hospitalization, incarceration, commitment, loss of freedom, reputational harm, lost wages, lost earning capacity, and other damages.

**Count II – Negligence/Medical Malpractice/Failure to Warn and Protect Under the FTCA – Martin Alan Larsen Individually Against the United States**

207. Plaintiff Martin Alan Larsen, individually, incorporates by reference all preceding paragraphs as though fully set forth herein.

208. The United States, through VA employees and agents, owed Martin duties under California law because Martin was a foreseeable and identifiable victim of Julia's known or knowable risk of violence, psychosis, paranoia, suicide, and lethal-means danger; because the VA undertook to provide crisis triage and mental-health care to Julia; because VA staff knew Julia was leaving in Martin and Candace's care; and because VA staff knew or should have known that family involvement, risk assessment, warning, and lethal-means counseling were necessary to protect Martin.

209. The United States breached those duties by failing to assess Julia's risk to Martin, failing to warn Martin and Candace of known threats and danger, failing to engage them in suicide and violence risk assessment, failing to instruct them to secure firearms and other weapons, failing to send Julia to an appropriate emergency facility, and failing to provide adequate care before releasing Julia to their supervision.

210. The United States also breached duties by negligently managing Julia's medications and mental-health care in the weeks and years before the incident, creating or worsening the risk of psychosis, mania, violence, and acute decompensation.

211. Under California law, private psychiatric providers, medical clinics, hospitals, mental-health professionals, triage providers, social workers, and medication-management providers would be liable under like circumstances for negligent professional care, negligent crisis assessment, negligent discharge or release planning, and negligent failure to warn or protect foreseeable and identifiable victims/caregivers.

212. As a direct and proximate result, Martin was attacked, beaten, bitten, lacerated, suffered fractures and traumatic injuries, endured terror and emotional distress, nearly died,

watched his wife bleed to death, and sustained continuing physical, psychological, medical, economic, and quality-of-life damages.

**Count III – Wrongful Death Under California Code of Civil Procedure § 377.60 and the FTCA – Martin Alan Larsen, Julia Deanna Larsen and Lauren Melville, individually, Against the United States**

213. Plaintiffs Martin Alan Larsen, individually, Julia Deanna Larsen, individually, and Lauren Melville, individually, incorporate by reference all preceding paragraphs as though fully set forth herein and bring this Count in their individual capacities as the surviving spouse and surviving children of Candace Larsen, Deceased, pursuant to California Code of Civil Procedure §377.60 and the FTCA.

214. Candace Larsen died because of the negligent and wrongful acts and omissions of VA employees and agents acting within the scope of federal employment.

215. Plaintiff Martin Alan Larsen is Candace Larsen's surviving spouse and is authorized to bring this wrongful death action in his individual capacity pursuant to California Code of Civil Procedure § 377.60. Plaintiffs Julia Deanna Larsen and Lauren Melville are Candace Larsen's surviving children and are likewise authorized to bring this wrongful death action in their individual capacities pursuant to California Code of Civil Procedure § 377.60.

216. The United States, through VA employees and agents, owed duties to Candace because she was a foreseeable and identifiable victim; because VA personnel knew Julia was in crisis and was leaving in Candace's care; because Candace had directly contacted VA seeking instructions; because Candace personally transported Julia to Chico CBOC; because VA personnel knew Candace would take Julia home; and because VA personnel knew or should have known that Julia presented risks of suicide, violence, psychosis, paranoia, and lethal-means danger.

217. Under California law, private psychiatric providers, medical clinics, hospitals, mental-health professionals, triage providers, social workers, and medication-management

providers would be liable under like circumstances for negligent professional care, negligent crisis assessment, negligent discharge or release planning, and negligent failure to warn or protect foreseeable and identifiable victims/caregivers.

218. The United States breached those duties by misdirecting Candace to bring Julia to an inadequately staffed clinic, failing to send Julia to Mather or another emergency facility, failing to complete risk assessment, failing to warn Candace of known threats and dangers, failing to engage Candace in risk assessment, failing to advise Candace to secure firearms and dangerous weapons, and releasing Julia to Candace's care without adequate stabilization or safety planning.

219. These breaches were a substantial factor in causing Candace to be attacked, beaten, shot, and killed.

220. Plaintiffs Martin Alan Larsen, Julia Deanna Larsen, and Lauren Melville seek wrongful death damages for the loss of Candace Larsen's love, companionship, comfort, care, assistance, protection, affection, society, and moral support; the loss of financial support and household services; funeral and burial expenses to the extent recoverable under California law and FTCA.

221. In addition to the foregoing damages, Plaintiff Martin Alan Larsen, in his individual capacity as Candace Larsen's surviving spouse, seeks damages unique to the spousal relationship, including the loss of the marital relationship, companionship, society, comfort, affection, sexual relations, and household services with Candace Larsen, to the extent recoverable under California law and FTCA.

**Count IV – Survival Action Under California Code of Civil Procedure §§ 377.20, 377.30, 377.32, and 377.34 and the FTCA – Martin Alan Larsen, as Successor in Interest to Candace Larsen, Deceased, Against the United States**

222. Plaintiff Martin Alan Larsen, as Successor in Interest to Candace Larsen, Deceased, pursuant to California Code of Civil Procedure §377.30 and 377.32, incorporates by reference all preceding paragraphs as though fully set forth herein.

223. Candace Larsen possessed claims for negligence, medical negligence, failure to warn, failure to protect, and related torts before her death. Those claims survived her death under California law.

224. Martin is authorized to assert the survival claims that belonged to Candace Larsen, Deceased, in his capacity as the successor in interest to Candace Larsen pursuant to California Code of Civil Procedure §§377.11, 377.30, and 377.32.

225. The United States' negligent acts and omissions caused Candace to suffer pre-death injuries, including blunt-force trauma, gunshot wound, femoral-vein injury, blood loss, physical pain, fear, emotional distress, and terror before death.

226. Under California law, private psychiatric providers, medical clinics, hospitals, mental-health professionals, triage providers, social workers, and medication-management providers would be liable under like circumstances for negligent professional care, negligent crisis assessment, negligent discharge or release planning, and negligent failure to warn or protect foreseeable and identifiable victims/caregivers.

227. Plaintiff Martin Alan Larsen, as Successor in Interest to Candace Larsen, Deceased, seeks all damages recoverable in a survival action and under the Federal Tort Claims Act, including economic damages, pre-death pain, suffering, disfigurement, fear, terror, and all other damages recoverable pursuant to California Code of Civil Procedure §377.34 and applicable law.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request judgment against the United States of America as follows:

228. For damages on behalf of Julia Deanna Larsen in an amount according to proof, subject to the FTCA and the administrative amount presented, including but not limited to personal injuries, medical expenses, future care, psychiatric injuries, emotional distress, loss of freedom, lost wages, loss of earning capacity, pain, suffering, and other legally recoverable damages.

229. For damages on behalf of Martin Alan Larsen, individually, in an amount according to proof, subject to the FTCA and the administrative amount presented, including but not limited to personal injuries, medical expenses, future care, emotional distress, pain, suffering, lost income or earning capacity, loss of enjoyment of life, and other legally recoverable damages.

230. For wrongful death damages in favor of Plaintiffs Martin Alan Larsen, Julia Deanna Larsen, and Lauren Melville, in their individual capacities as the surviving spouse and surviving children of Candace Larsen, Deceased, in an amount according to proof, subject to the FTCA and the administrative amount presented.

231. For survival damages in favor of Plaintiff Martin Alan Larsen, as Successor in Interest to Candace Larsen, Deceased, in an amount according to proof, subject to the FTCA and the administrative amount presented.

232. For costs of the suit and allowable litigation expenses as permitted by law; and

233. For such further relief the Court deems just and proper.

Dated: July 1, 2026 **ROSENBLUM SCHWARTZ FRY & JOHNSON, P.C.**

By: _/s/ Tanner C. Rolfes_
Tanner C. Rolfes (MO Bar #72987)
120 South Central Avenue, Suite 130
Clayton, Missouri 63105
P: (314) 862-4332
Trolfes@RSFJLaw.com

Dated: July 1, 2026 **BAILEY PLLC**

By: */s/ Landon D. Bailey*

Landon D. Bailey, (CA Bar #240236)
1200 Suncast Lane, Suite 7
El Dorado Hills, CA 95762
Telephone: (916) 713-2580
Email: landon@baileyplc.com

Attorneys for Plaintiffs